No. 14564

IN THE SUPREME COURT OF THE STATE OF MONTANA

1979

_____

PIERRE DUMONT (deceased)
VIRGINIA DUMONT,

Claimant and Appellant,

-vs-

WICKENS BROS. CONSTRUCTION COMPANY,

Employer,

and

AETNA FIRE UNDERWRITERS,

Defendant and Respondent.

_____

Appeal from: Workers' Compensation Court
Hon. William E. Hunt, Judge presiding.

Counsel of Record:

For Appellant:

Torger S. Oaas argued, Lewistown, Montana

For Respondent:

Andrew J. Utick argued, Helena, Montana

_____

Submitted: June 6, 1979

Decided: AUG - 9 1979

Filed: AUG - 9 1979

_Thomas J. Kearney_
Clerk

Mr. Justice John Conway Harrison delivered the Opinion of the Court.

Through a hearing before the Workers' Compensation Court on December 1, 1977, claimant, Virginia Dumont, sought compensation benefits for the death of her husband which she alleged was the result of an injury he received in the course and scope of his employment by Wickens Bros. Construction Company on October 12, 1976. The Workers' Compensation Court denied the claim. Claimant petitioned for a rehearing before the lower court, and oral argument was heard as to whether a rehearing should be granted. By order dated and filed on September 29, 1978, the Workers' Compensation Court denied claimant's request for a rehearing. On October 31, 1978, 31 days after the date of denial of the rehearing, the Workers' Compensation Court received and filed claimant's notice of appeal to this Court.

Respondent insurance company moved to dismiss this appeal on the ground that this Court lacks jurisdiction because claimant failed to file a notice of appeal within the time allowed by law. This Court ordered the appeal set for oral argument and the motion to dismiss as well as the merits of the appeal were argued.

Pierre (Pete) Dumont died on or about October 12, 1976, of a heart attack in his bed in his trailer home which had been moved to a job site near Forsyth, Montana, from Dumont's home in Lewistown. His body was discovered in bed by others who investigated when he did not report for work. On October 14, 1976, an autopsy was performed on the body of the deceased. The final anatomical diagnosis contained in such autopsy report reveals the following findings:

"I.  Marked stenosing arteriosclerosis of coronary arteries with:

"A.  Recent thrombosis of posterior right coronary artery.

"B.  Old occlusion, anterior descending branch of left coronary artery.

"C.  No gross evidence of recent or past myocardial infarction.

"II.  Hyperemia of lungs and liver.

"III.  Chronic pulmonary emphysema.

"IV.  Obesity.

"V.  Compression fracture of first lumbar vertebra, clinical."

In her claim, claimant alleged that the deceased was subjected by his job to unusual strain and suffered an injury as defined in section 39-71-119 MCA, and that such injury arose out of and was in the course of his employment. The claim for compensation listed the date of such alleged injury as October 12, 1976.

At the hearing several lay witnesses were called to testify concerning the deceased's job activities and particularly concerning his activities on October 12, 1976. In general such witnesses testified that his activities on the day of his death were quite normal.

Claimant, who was not present on the job site on October 12, 1976, attempted to paint an entirely different picture. She testified in considerable detail about the duties, the long hours, and stresses and strains that the deceased was subjected to during the construction season of 1976. However, on cross-examination she admitted that the deceased, an employee of Wickens Bros. Construction Company for many years, was subjected in preceding years to similar stresses and strains and worked long hours, including weekends.

Claimant further testified that the deceased, on July 21, 1976, suffered an injury to his back and leg in an on-the-job incident and was hospitalized for about three days following which he remained home for one week. Claimant testified that the deceased returned to work before he was released by his physician and worked with pain. She stated that she spent time on the job site so she could assist with driving and treat his injured leg. She stated that during September 1976 the deceased had been having problems with his sleep and on occasions when he could not sleep would arise in the night and go out on the job.

On October 12, 1976, claimant was not on the job site at Forsyth. Over objection of the respondent, claimant was allowed to testify that on the morning of October 12, 1976, her husband called her at Lewistown about two hours later than usual prior to his trip to Billings. She stated that he seemed upset and had stated to her that "all hell broke loose." When asked what had happened, he stated that it would take too long to explain and he would do so on the weekend. She further stated that he departed from his customary statement in closing a telephone conversation by saying goodbye without saying that he loved her. Claimant was unable to explain what the deceased was referring to in his phone coversation. She stated that she had attempted to determine from other employees what had occurred to give rise to the statement made to her by her husband on the telephone but had learned nothing.

Respondent insurance company states that the crucial significance of the events of October 12, 1976, was explained by the medical witness. Dr. Hollis K. Lefever, testifying on behalf of claimant, was provided with a copy of the

-4-

autopsy report. He was asked, over respondent's continuing objection, to respond to a hypothetical question based in large degree on certain disputed facts of the case and, respondent contends, on certain facts which were not in evidence. The hypothetical question asked of Dr. Lefever contained reference to the deceased's back injury of July 21, 1976; it contained reference to an alleged incident nine days before the death when the deceased loaded some anti-freeze into his pickup; it contained reference to an alleged incident two days before the death when the deceased allegedly hurt himself while loading a radiator into his pickup; and it contained reference to claimant's version of the events of October 12, 1976, and the deceased's trip to Billings for parts. On cross-examination, Dr. Lefever stated:

> "Q. Doctor, in the hypothetical that Mr. Oaas asked you to assume, is there any one incident or any one day in the fact situation given to you, that you could point to as the cause of this death, or is it just a build-up of all of these things? A. Well, I think the only day stated in the hypothetical question in which there was any chain of events that I might re-late to this is, if I recall the hypothetical question correctly, concerning the hasty trip to Billings and the handling of heavy equip-ment. . ."

Thus, argues respondent, Dr. Lefever, claimant's expert witness, made the events of October 12, 1976, critical to the case. Throughout the rebuttal testimony of Dr. Lefever, he kept referring to the events of "that day"--referring to October 12, 1976. Dr. Stephen Cade, respondent's expert witness, when asked the same hypothetical question as had been asked of Dr. Lefever, did not feel that there was any probable relationship between the events of October 12 and the death. However, he did explain that the closer in time that events of physical or emotional stress were to the

death, the more likelihood there was of some relationship between the two.

Based on the above, the hearings examiner summarized the testimony surrounding the events of October 12, 1976, as follows:

"18. That four witnesses testified that they had seen and talked with Pete Dumont on the day of his death but that none of them observed him to be showing any signs of stress or strain, physical or emotional. None of those witnesses were aware of any unusual problems at the job, and none of them recall Pierre Dumont having mentioned any unusual problems.

"19. That the only evidence that the deceased was undergoing unusual stress or strain is that from the testimony of the claimant, the widow of Pierre Dumont, who stands to gain, and that little or none of that testimony is corroborated by other evidence."

The following issues are raised on appeal:

1. Should this appeal be dismissed since this Court lacks jurisdiction because claimant failed to timely file a notice of appeal?

2. Did the Workers' Compensation Court err in denying benefits to claimant under the Workers' Compensation Act?

The first issue is directed at claimant's failure to timely file a notice of appeal. This Court has never been called upon to rule in a case involving the issue of the timeliness of filing a notice of appeal from a decision of the Workers' Compensation Court.

Section 39-71-2904 MCA provides:

"Notwithstanding 2-4-701 through 2-4-704, an appeal from a final decision of the workers' compensation judge shall be filed directly with the supreme court of Montana in the manner provided by law for appeals from the district court in civil cases."

As to what constitutes a "final decision" of the Workers' Compensation judge, Rule 19 of the Workers' Compensation Court Rules (hereinafter referred to as WCCR) provides:

-6-

"19A. The Court will, after the hearing,
issue findings of fact and conclusions of law
and an order setting forth the Court's deter-
mination of the disputed issues. The parties
to the dispute may consider this order as a
final decision of the Court for appeals pur-
poses. However, any party to the dispute may
request a rehearing before the Court within
twenty (20) days after a party receives a copy
of the order, and if any party submits a re-
quest for rehearing, the order issued by the
Court shall not be considered a final decision
of the Court for appeals purposes.

"19B. If a request for a rehearing is filed,
the parties requesting the rehearing shall set
forth specifically and in full detail the
grounds upon which the party considers the
order to be incorrect. If the Court denies
the request for rehearing, the original order
issued by the Court shall be considered the
final decision of the Court as of the day the
rehearing is denied. If a rehearing is granted
the matter will be set for hearing. The matter
will be determined by the testimony taken at
the initial hearing and at the rehearing. Af-
ter the rehearing, the Court will issue an order
setting forth the Court's final determination
of the disputed issues."

Finally, Rule 5, M.R.App.Civ.P., states in pertinent
part:

"The time within which an appeal from a judg-
ment or an order must be taken shall be 30 days
from the entry thereof . . ."

The findings of fact and conclusions of law in this
matter were adopted by the Workers' Compensation Court by
order dated June 19, 1978. Claimant had 30 days thereafter
within which to file a notice of appeal (Rule 5, M.R.App.Civ.P.)
or 20 days within which to file a request for rehearing
(Rule 19, WCCR). On June 29, 1978, according to the certi-
ficate of mailing, claimant mailed to the clerk of the
Workers' Compensation Court, a request for rehearing. The
filing of a request for rehearing suspended the time for
filing of a notice of appeal.

Thereafter, respondent filed formal objections to the
sufficiency of claimant's request for rehearing, and claimant,

-7-

in response to such objections, filed an amendment to her request for rehearing. On August 23, 1978, the Workers' Compensation Court heard oral argument on whether a rehearing should be granted. The Workers' Compensation Court entered its order denying rehearing and returning the file to the Division of Workers' Compensation on September 29, 1978. In addition to denying the rehearing, this order had the effect of making the original order of the Workers' Compensation Court the final decision of the court for appeal purposes as of the day the rehearing was denied--September 29, 1978. Thus, the last suspended day for the filing of a notice of appeal was September 29, 1978, and claimant's first day to file a notice of appeal was, and the time limit to file the notice of appeal commenced running, as of September 30, 1978. Since September has only 30 days, the 30-day time limit of claimant to file a notice of appeal expired on October 29, 1978. However, since October 29, 1978, was a Sunday, it is not counted and the 30-day time limit to file a notice of appeal would expire on October 30, 1978. It was not until the final day of the appeal period, on October 30, 1978, that claimant mailed her notice of appeal for filing, and the same was not received by the clerk of the Workers' Compensation Court until Tuesday, October 31, 1978.

Under Rule 20(a), M.R.App.Civ.P., a notice of appeal is not deemed filed unless the notice is actually received by the clerk within the time fixed for filing. Thus, the notice of appeal was not received for filing by the clerk of the Workers' Compensation Court until the day after the appeal time expired. Accordingly, it is respondent's position that claimant has not timely perfected her appeal; that this Court is without jurisdiction to entertain the appeal;

-8-

and that claimant is barred from seeking to have the Workers' Compensation Court's decision changed or in any way reversed or modified.

Rule 4(a), M.R.App.Civ.P., which is made applicable to a Workers' Compensation Court proceeding by section 39-71-2904 MCA, provides:

> ". . . An appeal shall be taken by filing a notice of appeal in the district court. Failure of an appellant to take any step other than the timely filing of a notice of appeal does not affect the validity of the appeal, but is ground only for such action as the Supreme Court deems appropriate, which may include dismissal of the appeal."

Rule 4, M.R.App.Civ.P., is patterned after Rule 3 of the Federal Rules of Appellate Procedure. The second sentence of Rule 4(a), M.R.App.Civ.P., is identical to a like provision of Rule 3(a) of the Federal Rules. 9 Moore's Federal Practice ¶203.10 states:

> "The notice of appeal is filed with the clerk when it is received into his custody and control. Since timely filing of the notice is held to be essential to the jurisdiction of the court of appeals, the precise time that the notice was filed can be of overwhelming importance. The most certain way to effect timely filing is to deliver the notice to the office of the clerk personally on or before the date fixed for filing. But since personal delivery is often inconvenient and expensive, mailing is very frequently resorted to. When delivery is to be effected by mail, it must be borne in mind that the notice must be received by the clerk within the time allowed for its filing. This is quite contrary to the usual rule respecting the service of papers required to be served, which is that timely mailing constitutes timely service."

It is likewise stated in 9 Moore's Federal Practice ¶204.02:

> "Discussion of the time for appeal must begin by directing attention to a host of cases holding with unanimity that unless an appeal is timely taken the reviewing court lacks jurisdiction to hear it. Although that holding is not as logically compelling as it once was, the necessity of providing a precisely ascertainable

point of time at which litigation comes to an
end strongly militates against its overthrow.
As the Committee Note accompanying Rule 3 [of
the Federal Rules] admonishes:

"'Rule 3 and Rule 4 combine to require that
a notice of appeal be filed with the clerk of
the district court within the time prescribed
for taking an appeal. Because the timely
filing of a notice of appeal is "mandatory
and jurisdictional", United States v. Robinson,
361 U.S. 220, 224 (1960), compliance with the
provisions of those rules is of the utmost
importance.'

"So care must be taken to insure that the
notice of appeal is filed with the clerk of
the district court within the time fixed for
the particular appeal by Rule 4. . ."

This is likewise the law of Montana. The above-mentioned

authorities were cited with approval and specifically

adopted by the Montana Supreme Court in connection with a

Workers' Compensation appeal before the creation of the

Workers' Compensation judge in Leitheiser v. Montana State

Prison (1973), 161 Mont. 343, 505 P.2d 1203, where this

Court dismissed an appeal filed by the defendant upon the

grounds that the notice of appeal had been filed three days

late. Respondent argues that this Court has consistently

followed the application of the above-stated rules many

times. State v. Wibaux County Bank (1929), 85 Mont. 532,

281 P. 341; Reid v. District Court (1953), 126 Mont. 489,

255 P.2d 693; McVay v. McVay (1954), 128 Mont. 31, 270 P.2d

393; Jackson v. Tinker (1972), 161 Mont. 51, 504 P.2d 692;

First National of Lewistown v. Fray (1978), ____ Mont. ____,

575 P.2d 1326, 35 St.Rep. 276.

Claimant contends that respondent has failed to compute

the time for filing the notice of appeal correctly. Claimant

initially states that the Montana Rules of Appellate Civil

Procedure became effective on January 1, 1968, approximately

eight years prior to the present day Workers' Compensation

Act (effective July 1, 1975). Therefore, claimant argues, there is no interplay between the Rules of Appellate Civil Procedure and the Workers' Compensation Act even though appeals from a decision of the Workers' Compensation Court are taken directly to the Supreme Court in the manner provided by law for appeals from a District Court in civil cases. Section 39-71-2904 MCA.

The obvious example of this is that it is not even exactly clear from a reading of Rule 4(a), M.R.App.Civ.P., where the notice of appeal is to be filed in the case of an appeal from a decision of the Workers' Compensation Court. Of course, the reasonable and common sense understanding and practice is to file it with the Workers' Compensation Court, treating it, in effect, as a "District Court" within the scope and purpose of Rule 4(a).

Respondent correctly points out that proceedings in the Workers' Compensation Court are not governed by the Rules of Civil Procedure and therefore is technically correct in asserting that Rule 77(d) and Rule 5, M.R.Civ.P., have no application here.

Respondent's argument ignores the fact that proceedings in the Workers' Compensation Court are governed by the Montana Administrative Procedure Act by direct mandate of section 39-71-2903 MCA. Thus, section 2-4-623 MCA of the Administrative Procedure Act applies. The pertinent part of this statute states:

> ". . . Parties shall be notified either personally or by mail of any decision or order . . ."

This provision of the above-cited statute is identical to Rule 77(d), M.R.Civ.P., insofar as requiring notice of decisions in Workers' Compensation cases.

We hold, therefore, that a person who appeals from a final decision of the Workers' Compensation Court should in all fundamental fairness be given the same benefit of that provision of Rule 5, M.R.App.Civ.P., which states that:

> ". . . except that in cases where service of notice of entry of judgment is required by Rule 77(d) of the Montana Rules of Civil Procedure the time shall be 30 days from the service of notice of entry of judgment."

This would mean, as is already the case where Rule 77(d), M.R.Civ.P., is applicable, that when service of the notice of the final decision of the Workers' Compensation Court is made as mandated by section 2-4-623 MCA and that service was made by mail, the provisions of Rule 21(c), M.R.App.Civ.P., are automatically put into play adding three days to the prescribed 30-day time limit for filing the notice of appeal.

Thus, when one correctly adds the time limit set by Rule 4(a), M.R.App.Civ.P., as extended by Rule 21(c), M.R.App.Civ.P., the 30th day from September 29, 1978, is October 29, 1978. Since that day happened to be a Sunday, Rule 21(a), M.R.App. Civ.P., comes into play making the 30th day October 30, 1978. However, as previously stated, Rule 21(c) comes into play adding three days to the prescribed period and the 33rd and final day for filing the notice of appeal was November 2, 1978. Thus, claimant's appeal was timely--not one day late as respondent claims.

The second issue concerns the merits of the decision of the Workers' Compensation Court in denying claimant's benefits.

This Court stated, at an early date, in Birdwell v. Three Forks Portland Cement Co. (1935), 98 Mont. 483, 495, 40 P.2d 43, 47:

> "In order for the plaintiff to prevail it was necessary for her to prove by a preponderance of the evidence that Birdwell suffered an industrial accident, and that the injury was the proximate cause of his death."

Perhaps the most succinct statement of the rule is found in Aho v. Burkland Studs (1969), 153 Mont. 1, 7, 452 P.2d 415, 418, where this Court stated: "The claimant has the burden of proving his case . . ."

Not only must claimant prove her case by a preponderance of the evidence, she must do so by a preponderance of the probative credible evidence. In LaForrest v. Safeway Stores, Inc. (1966), 147 Mont. 431, 437, 414 P.2d 200, 203, this Court stated:

> "The claimant has the burden to establish by a preponderance of the evidence that her condition resulted from an injury and not from a disease. [Citation omitted.] She has not sustained the burden of proof . . . By adroit questioning, claimant's counsel was able to get Dr. Davidson to admit to a 'possibility' of a supraspinatus tendon tear. However, such a 'possibility' is not probative credible testimony and will not, without more, supply evidence."

The burden was upon claimant to establish by a preponderance of the probative credible evidence that her husband had died as the result of an injury which he sustained in the course and scope of his employment. The Workers' Compensation Court heard extended testimony from many witnesses. The testimony was conflicting. The lower court had the opportunity to observe the demeanor of the witnesses and to judge their credibility. Following the hearing, the Workers' Compensation Court entered very detailed findings of fact and conclusions of law. After carefully considering the evidence, the lower court ruled in favor of the insurer and denied benefits to claimant. That decision comes to this Court with the presumption that it is correct. Sedlacek v. Ahrens (1974), 165 Mont. 479, 485, 530 P.2d 424, 427; Montana Farm Service Co. v. Marquart (1978), ____ Mont. ____, 578 P.2d 315, 316, 35 St.Rep. 1066, 1068.

The scope of review of a decision of the Workers' Compensation Court upon appeal has been stated many times. The rule is well summarized in Jensen v. Argonaut Insurance Company (1978), ____ Mont. ____, 582 P.2d 1191, 1193, 35 St.Rep. 1066, 1068, in the following language:

> "The standard of review applicable in determining the sufficiency of the evidence to support the findings of the Workers' Compensation Court has been stated in this language:
>
> "'Our function in reviewing a decision of the Workers' Compensation Court is to determine whether there is substantial evidence to support the findings and conclusions of that court. We cannot substitute our judgment for that of the trial court as to the weight of evidence on questions of fact. Where there is substantial evidence to support the findings of the Workers' Compensation Court, this Court cannot overturn the decision.' Steffes v. 93 Leasing Co. Inc. (U.S.F.&G.) (1978), ___ Mont. ____, 580 P.2d 450, 452, 35 St.Rep. 816, 818."

Applying this standard to the instant case respondent argues it is clear that the decision of the lower court must be affirmed. There was a sharp conflict in the facts, particularly in regard to the events of October 12, 1976. In its statement of the case, respondent set forth a summary of the testimony of each witness to the events of October 12, 1976, taken almost verbatim from the findings of fact of the lower court. Following each sentence are citations to the record which support the finding. Each and every fact found by the lower court is amply supported in the record. At the bottom line, the lower court chose to believe the testimony of Tom Wickens, Joseph Wickens, Myron Oakland, and Arlyn McJunkin rather than that of claimant. The decision as to the weight of the evidence on questions of fact is within the province of the Workers' Compensation Court and where, as here, it is supported by substantial evidence, this Court cannot overturn that decision.

-14-

The decision of the lower court was also correct in its conclusion that claimant failed to prove a compensable injury and that such an injury caused the death of her husband. For an injury to be compensable under the Workers' Compensation Act, it must meet the definitional requirements of the statute. Section 39-71-119 MCA defines injury as:

> "'Injury' or 'injured' means:
>
> "(1) A tangible happening of a traumatic nature from an unexpected cause, or unusual strain, resulting in either external or internal physical harm, and such physical condition as a result therefrom and excluding disease not traceable to injury . . ."

A discussion of what constitutes an injury has received a great deal of attention. Lupien v. Mont. Record Publishing Co. (1964), 143 Mont. 415, 390 P.2d 455; Miller v. City of Billings (1976), 171 Mont. 91, 555 P.2d 747; Hurlbut v. Vollstedt Kerr Co. (1975), 167 Mont. 303, 538 P.2d 344; Erhart v. Great Western Sugar Co. (1976), 169 Mont. 375, 546 P.2d 1055.

The medical evidence in the instant case supports the conclusion that the deceased died as the result of a disease process, progressive in nature, that is not "traceable to injury." In his rebuttal testimony, Dr. Lefever accurately characterized the testimony of Dr. Cade as follows:

> ". . . The fact of the matter is that Dr. Cade said that the death resulted from the normal sequence of events from the disease."

When pressed on this point, Dr. Lefever stated:

> "Q. What evidence is there in the record--by the record, I mean the testimony that you were able to observe and hear at the hearing on December 1st, to support a medical opinion to a reasonable degree of medical certainty that Mr. Dumont's death was merely the terminal event in the series of disease processes? A. Well, the original testimony showed the extent of the atherosclerotic process in his artery, the presence of atherosclerotic plaques and previ-

-15-

ously diseased vessels, and I think that it would be a logical conclusion that at some time this disease process would have progressed to this event or a similar event at sometime.

"Q. Is there any way that medical science can point a finger at a particular time and say when this will occur? A. No, I don't belive so. I think that frequently we see this disease as advanced or more advanced than this and see people who survive many years. I don't think there is any way of predicting with certainty what the outcomes are . . ."

Dr. Cade was a little more emphatic. He testified:

". . . it seems abundantly clear to me that he died of a disease process that had been occurring for years and years and that he had reached the typical end of that disease process."

Respondent believes that the most significant case in the instant matter is Hurlbut v. Vollstedt Kerr Co., supra. Hurlbut was decided after the 1967 amendment to the injury definition which added the words "or unusual strain" to the definition of an injury contained in section 39-71-119 MCA. The facts of Hurlbut are strikingly similar to the instant case and respondent submits that Hurlbut is controlling.

In Hurlbut the claimant was about 59 years old and had been employed by the lumber mill for ten years prior to the alleged accident--the last eight of those ten years as a superintendent. The policy of the employer was to not operate the mill when the temperature was too cold for the men and the machinery, and, in the latter part of December 1972, the mill had been shut down due to the cold for more than a week. On the afternoon of January 5, 1973, the temperature rose to about -12°F and the owner of the mill ordered claimant to start up the operation the next day, and the claimant began contacting men to report for work. The next morning, January 6, 1973, claimant arrived at work and waited in the office for telephone calls from the employees

to determine how many men would report. The temperature in the office was 50°F and claimant had his coat on. The outside temperature was -6°F, with low wind velocity. While sitting in the office, the claimant became dizzy and went outside to see if a little fresh air would help, but then became nauseated. He went home and his wife drove him to the hospital where his doctor diagnosed a myocardial infarction (heart attack). The claimant argued that he was entitled to compensation because the mill had never before been operated in weather as cold as it was that morning. He maintained that this condition constituted "unusual strain" because it was a unique, new, different and unusual demand placed upon claimant by the company. This Court, speaking through Justice Daly, affirmed a denial of compensation benefits, stating:

> "Any injury, to be compensable under the Workmen's Compensation Act, must meet the definitional requirements of the statute. Section 92-418, R.C.M. 1947, defines injury as

> "'a tangible happening of a traumatic nature from an unexpected cause, or unusual strain, resulting in either external or internal physical harm, and such physical condition as a result therefrom and excluding disease not traceable to injury * * *'

> "Thus, there are two elements in the statute which must be met (1) there must be a tangible happening of a traumatic nature, and (2) this must be shown to be the cause of physical harm.

> "Aside from the testimony that it was a few degrees colder than normal starting temperature and the mill had not previously operated in temperatures that cold, there was no testimony this imposed upon claimant any duty which was unusual in kind or amount. The duties performed by claimant on the day before his attack and on the day of the attack, January 6, 1973, were duties he had performed for the previous eight years as plant superintendent. Simply opening a mill on a day colder than was customary, with no inordinate kind or amount of work on his part, cannot be said to constitute 'a tangible happening of a traumatic nature.'

Claimant has failed to carry the burden of proof that he was injured, within the meaning of the statute." Hurlbut, 167 Mont. at 306-07, 538 P.2d at 346.

Applying the test enunciated in Hurlbut to the instant case, it would seem that weak as the facts were in Hurlbut, they were stronger than those in the instant case. Claimant's own medical witness stated: "Well, I think the only day stated in the hypothetical question in which there was any chain of events that I might relate to this is, if I recall the hypothetical question correctly, concerning the hasty trip to Billings [which occurred on October 12, 1976] . . . ." Thus, Dr. Lefever ruled out any possible causal connection between the death and any of the events which allegedly preceded October 12, 1976. A search of the entire record fails to disclose anything unusual that occurred to the deceased on October 12, 1976, or even, for that matter, that the deceased's trip to Billings was "hasty." The only testimony to the contrary was the widow's testimony concerning her husband's phone call to her.

In her brief, claimant relies on the cases of Jones v. Bair's Cafe (1968), 152 Mont. 13, 445 P.2d 923; Robins v. Ogle (1971), 157 Mont. 328, 485 P.2d 692; and Love v. Ralph's Food Store (1973), 163 Mont. 234, 516 P.2d 598. Claimant argues, incorrectly, that these cases only require a showing of some "unusual strain," either from the standpoint of a cause or effect, to meet the definitional requirements of an injury under the act. Claimant's analysis totally ignores the independent requirement that a strain must result from a tangible happening of a traumatic nature. The following language from Erhart v. Great Western Sugar Co. (1976), 169 Mont. 375, 380-81, 546 P.2d 1055, 1058, quickly disposes of claimant's argument:

"Not only must claimant show an unusual strain, but that the strain must result from a tangible happening of a traumatic nature. [Citations omitted.] In Love v. Ralph's Food Store, 163 Mont. 234, 516 P.2d 598, we stated that Jones and Robins made this rule clear. See, also, the earlier cases: Lupien v. Montana Record Publishing Co., 143 Mont. 415, 390 P.2d 455; James v. V.K.V. Lumber Co., supra; Miller v. Sundance Recreation, Inc., 151 Mont. 223, 441 P.2d 194."

Claimant must still prove that her husband's death was the result of a "tangible happening of a traumatic nature", which she totally failed to do.

Finally, in her brief, claimant takes issue with the lower court's findings in connection with the medical testimony in the case as it relates to the causal relationship between stress and sudden coronary death. She cites some passages from Dr. Lefever's original testimony at the December 1, 1977, hearing which, when taken out of context as they are, appear to support her position. Respondent contends, and we agree, that claimant ignores Dr. Lefever's testimony in rebuttal which, as quoted previously, was different from his original testimony when confronted with the testimony of Dr. Cade. On rebuttal, Dr. Lefever admitted: ". . . there is more than one opinion about the significance of stress in sudden death." On redirect exam during the rebuttal deposition, Dr. Lefever stated:

"Q. And going back to what Mr. Utick said, is there an acute difference of opinion among the medical community as to the cause of tension between stress and the initiating events and the original hemorrhage? A. Yes.

"Q. There are thoughts on that both ways? A. There are more than one opinion about the significance of stress with relation to intimal hemorrhage."

As Dr. Cade summarized:

". . . It is not clear what the role of chronic stress is on the cardiovascular system. It is

not clear whether stress can play a role in
sudden death, in acceleration of coronary artery
disease process.  The studies are conflicting
or the problem has not been adequately studied
or no good study shows this and that or the
other thing."

In summary, the testimony of both doctors agree that

the medical community just does not know whether stress

plays a role in sudden death or accelerates coronary artery

disease.  The lower court had all the medical testimony

before it.  A review of the entire testimony of both doctors

reflects that the trial court quite adequately summarized

such testimony in its findings and did not err in its find-

ings.  There was substantial evidence to support the findings

of the court in denying benefits to claimant.

The judgment of the court is affirmed.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____
Justices

-20-