No. 14732

IN THE SUPREME COURT OF THE STATE OF MONTANA

1979

---

VIOLETTE MOEN,

    Claimant and Respondent,

 -vs-

DECKER COAL COMPANY, Employer,

  and

EMPLOYERS MUTUAL LIABILITY INSURANCE
COMPANY OF WISCONSIN,

    Defendant and Appellant.

---

Appeal from: Workers' Compensation Court
       Honorable William E. Hunt, Judge presiding.

Counsel of Record:

 For Appellant:

   Crowley, Haughey, Hanson, Toole & Dietrich, Billings,
    Montana
   Randy Bishop argued, Billings, Montana

 For Respondent:

   Hoyt and Lewis, Great Falls, Montana
   John Hoyt argued, Great Falls, Montana

---

        Submitted: September 21, 1979

         Decided: DEC 14 1979

Filed: DEC 14 1979

Thomas J. Kearney
             Clerk

Mr. Chief Justice Frank I. Haswell delivered the Opinion of the Court.

Employers Mutual Liability Insurance Company of Wisconsin, the insurance carrier for the employer, Decker Coal Company, appeals from a judgment of the Workers' Compensation Court entered on behalf of Violette Moen, the claimant for benefits due pursuant to the Montana Workers' Compensation Act.

Mike Moen, decedent and husband of the claimant, was employed as an oiler by Decker Coal Company at Decker, Montana. On Saturday, November 1, 1975, the decedent was working overtime steam cleaning various pieces of heavy equipment. This was a task which was not part of his usual job. Superintendent, Delmar Bradway had the decedent steam cleaning a row of equipment during the morning. After noon, the only remaining employees left at the site were Bradway and the decedent.

Bradway testified that he and the decedent operated the steam cleaner in the afternoon on the same equipment which had been cleaned that morning in order to clean the batteries. Although a union agreement with the Decker Coal Company contains provisions prohibiting supervisory personnel from doing the tasks of the rank and file members, Bradway testified that he operated the steam cleaner while the decedent drove an old Ford F600 truck on which the steam cleaner was mounted. When they finished the job, the decedent was assigned the task of draining the cleaner and storing the hoses. The work day terminated about 3:30 p.m. Bradway also testified that the decedent drove away in his pickup truck and did not report any injury or ill effects from working that day.

The decedent visited briefly with James McCarthy, the owner of the grocery store and post office in Decker, Montana, sometime between 3:50 p.m. and 4:50 p.m. the same day but did not indicate

to McCarthy any ailments. About twenty minutes later the decedent again came to McCarthy's premises and asked McCarthy to drive him to Sheridan, Wyoming, some 35 miles away. McCarthy testified that the decedent looked pale and promised to take him as soon as he finished repairing a pump in his basement.

The decedent did not wait but apparently drove himself to Memorial Hospital in Sheridan where he was admitted at approximately 6:00 p.m. Upon admission the decedent related a history to the attending physician, Dr. William Williams, of having an abrupt onset of left anterior chest pain with pain radiating into the left arm at approximately 2:00 p.m., the same day. The decedent further indicated that the pain went to its peak intensity within ten to fifteen minutes and then continued until he presented himself at the hospital. An electrocardiogram was performed and findings were consistent with an acute anterior myocardial infarction.

The decedent was put on a monitor and treated with medication until approximately 2:57 a.m., November 2, 1975 when his heart changed rhythm (arrhythmia) and after several electric shock treatments and medication, the decedent died at 3:35 a.m. on November 2, 1975. The cause of death was stated as an anterior myocardial infarction with cardiac arrest. No autopsy was performed. The decedent was 63 years of age.

A claim for compensation was filed by the decedent's widow on September 27, 1976. The claim was denied by the appellant on the grounds that Moen's death was not causally related to his employment. A petition seeking a hearing before the Workers' Compensation Court was filed on August 31, 1977 and amended January 25, 1978. Pretrial conferences were held on September 1, 1977, April 6, 1978 and July 13, 1978. After several post-ponements, the matter was heard on August 2, 1978. Following the

-3-

hearing, briefs were filed by both parties. On January 29, 1979, the decision of the court was rendered with findings of fact and conclusions of law finding that Moen's death was causally related to his employment and holding appellant liable to claimant for benefits.

The two issues presented on this appeal are whether the decedent suffered a compensable "injury" as defined by section 39-71-119, MCA, and if so whether such injury arose "out of and in the course of his employment" within the scope of section 39-71-407, MCA? We find that the first issue is dispositive of the case and reverse based upon the following reasoning.

Section 39-71-119, MCA, states in pertinent part:

"Injury or injured defined. 'Injury' or 'injured' means:

"(1) a tangible happening of a traumatic nature from an unexpected cause or unusual strain resulting in either external or internal physical harm . . ."

There are two elements in the statute which must be met:

"(1) there must be a tangible happening of a traumatic nature, and

"(2) this must be shown to be the cause of physical harm." (To the worker.) Dumont v. Wickens Bros. Const. Co. (1979), ____ Mont. ____, 598 P.2d 1099, 1108, 36 St.Rep. 1471, 1482; Hurlbut v. Vollstedt Kerr Co. (1975), 167 Mont. 303, 538 P.2d 344.

In explaining the first element of the injury formula, this Court has stated:

"A tangible happening must be a perceptible happening, Webster's Third New International Dictionary. Some action or incident, or chain of actions or incidents, must be shown which may be perceived as a contributing cause of the resulting injury. This Court has found neuroses compensable, but a tangible, real happening must be a cause of the condition." Stamatis v. Betchel Power Corp. (1979), ____ Mont. ___, 601 P.2d 403, 406, 36 St.Rep. 1866, 1870; Erhart v. Great Western Sugar Company (1976), 169 Mont. 375, 381, 456 P.2d 1055, 1058.

Regarding the causal element, the death must still be proven to be the result of a tangible happening of a traumatic

-4-

nature. The claimant bears the burden of proving by a pre-
ponderance of the evidence that a tangible happening of a
traumatic nature proximately caused physical harm, McAndrews
v. Schwartz (1974), 164 Mont. 402, 412, 523 P.2d 1379, 1384,
and must show more than the mere possibility that the happening
caused the harm. Erhart, 169 Mont. at 380, 546 P.2d at 1058;
Stordahl v. Rush Implement Co. (1966), 148 Mont. 13, 20, 417
P.2d 95. If the evidence indicates a worker suffered a
heart attack while at work, rather than as a result of work,
no injury occurred under the statute. Ness v. Diamond Asphalt
Company (1964), 143 Mont. 560, 564-65, 393 P.2d 43, 45-46.

Applying this bifurcated test to the record in the present
case demonstrates that the statutory requirements are not
satisfied. Here there is no tangible happening of a traumatic
nature. The only evidence going to the satisfaction of this
requirement is a notation on the records of the hospital medical
room indicating that the decedent's peak intensity of pain occurred
at approximately 2:00 p.m. on Saturday, November 1, 1975. Alone
this evidence is insufficient.

The remaining evidence which respondent asserts as
supportive of a valid claim goes to the collateral matter of
aggravation of the decedent's condition and are not solid
links forming a chain of events required by this Court in
Erhart, supra. The testimony of Dr. Fletcher that the
continued activity of the decedent lessened his chance of
survival as well as the lack of proximity to a hospital are
factors which may have aggravated the underlying myocardial
infarction but they do not complete the chain of events.

Claimant argues that several New Jersey cases are on point
with the current case and that the courts there found the
existence of a compensable injury. However, what claimant fails

-5-

to recognize is "[t]he displacement of the unusual-exertion requirement in New Jersey by an essentially causal test . . ." Larson's Workmen's Compensation Law §38.64(b) at 7-185. Claimant's argument disregards Montana's independent requirement that a strain must result from "a tangible happening of a traumatic nature" in order to be compensable.

> "Not only must claimant show an unusual strain, but that the strain must result from a tangible happening of a traumatic nature. [Citations omitted.] In Love v. Ralph's Food Store, 163 Mont. 234, 516 P.2d 598, we stated that Jones [v. Bair's Cafe (1968), 152 Mont. 13, 445 P.2d 923;] and Robins [v. Ogle (1971), 157 Mont. 328, 485 P.2d 692,] made this rule clear. See, also, the earlier cases: Lupien v. Montana Record Publishing Co., 143 Mont. 415, 390 P.2d 455; James v. V.K.V. Lumber Co., [145 Mont. 466, 401 P.2d 282], supra; Miller v. Sundance Recreation, Inc., 151 Mont. 223, 441 P.2d 194." Dumont v. Wickens Bros. Const. Co. (1979), ____ Mont. ____, 598 P.2d 1099, 1108, 36 St.Rep. 1471, 1483 citing Erhart, 546 P.3d at 1058.

As we stated in Dumont and we reaffirm as applicable here: "Claimant must still prove that her husband's death was the result of a 'tangible happening of a traumatic nature,' which she totally failed to do." Dumont, supra.

Moreover, these factors completely fail to satisfy the causation element of the formula. The record is devoid of any evidence that the heart attack occurred as a result of work within the meaning of Ness, supra.

Since this Court finds no injury within the purview of section 39-71-119, MCA, we hold that the decedent did not sustain a compensable injury.

Reversed.

_____
Chief Justice

We Concur:

_____

_____
Justices

-6-

Mr. Justice John C. Sheehy dissenting:

The majority does not meet head on the basic fact situation established by the claimant on which the Workers' Compensation Court found in favor of the claimant.

The facts as found by the Workers' Compensation Court include these:

> "That the testimony reveals that the decedent reported for work about 8:00 a.m. Saturday, November 1, and was assigned the task of steam cleaning engines and transmissions of certain heavy equipment operated by the employer. His regular duties for which he was employed were those of an oiler. The decedent was described as a good oiler and worker. That the job of steam cleaning was different from the job of an oiler.

> "That the task of steam cleaning was described as an unpleasant, dirty job which required one to drag around the steam hoses from one part of a machine or one machine to another. The steam cleaner wore rain gear and goggles for protection from getting wet and dirty. That the job was described as not being more difficult than the job of oiler.

> "That Delmar Bradway, Maintenance Superintendent, testified that the decedent worked at steam cleaning until about noon on November 1 then had lunch. He stated also that two mechanics who also were working overtime on November 1 were excused at noon because they wanted to go home. Apparently in the afternoon the only employees left at the site were Bradway and the decedent.

> "Bradway further testified that in the afternoon he and the decedent operated the steam cleaner to get steam off the batteries on the equipment. He said that he operated the steam cleaner while the deceased drove an old Ford F600 truck on which the steam cleaner was mounted. They finished the job and the decedent was assigned to the task to drain the steam cleaner and hang up the hoses. The work day, according to the record, terminated about 3:30 p.m.

> ". . .

> "That Bradway testified that the decedent signed himself off the job at 3:30 p.m. and drove away in his pickup truck and did not report any injury or ill effects from working on the job. He later saw the decedent standing by his pickup with the hood raised and again the decedent did not indicate that there were any ill effects from the job.

> "That James McCarthy, an employer of Peter Kiewit and Sons who also owns the grocery store and post office in Decker, Montana saw the decedent sometime

-7-

between 3:50 p.m. and 4:50 p.m. on November 1, 1975 in the yard at his store. The decedent and McCarthy visited as they did on many occasions in the past. According to McCarthy the decedent did not indicate that he wanted to see a doctor nor that he was feeling bad. McCarthy then excused himself and went to work on a pump in the cellar of his building. A short time later the decedent came to the door, knocked, and McCarthy came up from the cellar. The decedent asked McCarthy, a long time friend, to take him to town, which he had never done before; and McCarthy said that he would be with him in ten minutes, as soon as he was through with the task of fixing the pump in his basement. Twenty minutes later McCarthy saw the decedent. He looked pale and wasn't his usual self.

"That the decedent apparently drove himself to Memorial Hospital of Sheridan County, Wyoming a distance of approximately 35 miles, where he was admitted at approximately 6:00 p.m. on November 1, 1975. Upon admission the decedent gave a history to the attending physician, Dr. William Williams, of having an abrupt onset of left anterior chest pain with pain radiating into the left arm at approximately 2:00 p.m. November 1, 1975. The deceased further indicated that the pain went to its peak intensity within 10 to 15 minutes and then continued until he presented himself at the hospital. An electrocardiogram was performed and findings were consistent with an acute anterior myocardial infarction.

"That the decedent was put on a monitor and treated with medication until approximately 2:57 a.m. November 2, 1975 when his heart changed rhythm and, after several electric shock treatments and medication, the decedent died.. . .

"Dr. Donald G. Fletcher, a physician and surgeon who practices in Conrad, Montana, testified on behalf of the claimant during which testimony the following facts were established:

> "a. An anterior myocardial infarction is the most severe type of myocardial infarction because the left anterior coronary arteries supply blood to roughly half the heart.

> "b. That the decedent suffered the actual attack at the time the pain reached its peak intensity which is approximately 2:00 p.m. according to the history given to Dr. Williams on November 1, 1975. The hospital records regarding this history have been stipulated into evidence.

> "c. After suffering a myocardial infarction at approximately 2:00 p.m. November 1, 1975, the decedent's continued employment activities, which, according to Delmar Bradway, consisted of driving a 1963 or 1964 F600 Ford truck, without power steering, and with a four speed manual transmission with clutch, from one scraper

to another for approximately one and one
half hours, and thereafter driving himself
in an automobile to a hospital, a distance
of approximately 35 miles, aggravated the
existing, underlying myocardial infarction.
The said aggravation consisted of exertion
caused by the above activities which placed
an unusual demand on the decedent's heart
thereby causing further muscle damage to the
heart, making the heart more susceptible to
arrhythmia or anoxic fibrillation. The
employment activities of the decedent after
2:00 p.m. November 1, 1975, and exertion caused
by those activities reduced the decedent's
chances of living.

"d. That prompt first aid and medical attention
as soon after the onset of attack as possible
is the most important time for treatment of this
kind of injury. Such treatment consists of
immediate hospitalization, the administration of
oxygen, medication, monitoring, and placing the
patient in complete physical and emotional rest.

". . .

"That based on the testimony of Drs. Fletcher and Williams
the activities engaged in by the decedent after the
onset of the symptoms of a myocardial infarction
probably were a contributing factor in causing the onset
of the arrhythmia that led to his death.

"That although the strain of the activities engaged in
by the claimant at the time of the onset of symptoms
of the myocardial infarction may not have been unusual,
the activities and the results of such activities and
the resulting myocardial infarction were unusual."

The foregoing findings of the Workers' Compensation Court

demonstrate that the claimant, Violette Moen came to this Court

backed by the Workers' Compensation Court in her claim that

the continued work exertions required of her husband after

the onset of his infarction, the strain to which he was put

thereafter, and the driving of the automobile necessary to

seek medical attention, were tangible happenings of a traumatic

nature from an unexpected cause or unusual strain that resulted

in internal physical harm. As a result therefrom he suffered

death. Her case fits absolutely within the definition of an

injury as set out in section 39-71-407, MCA.

The majority opinion contains no effort to explain away

or set aside the findings of fact of the Workers' Compensation

Court as we have set them forth above. In fact they could not

-9-

be set aside, because findings of the Workers' Compensation Court enjoy the protection of Rule 52, Mont.R.Civ.P., and must stand unless clearly erroneous. When substantial evidence supports the findings of Workers' Compensation Court, the appellate court cannot overturn them. Dumont v. Wickens Bros. Const. Co. (1979), ____ Mont.____, 598 P.2d 1099, 1106, 36 St.Rep. 1471, 1480. We followed that rule recently in Stamatis v. Bechtel Power Co. (1979), ____ Mont. ____, 601 P.2d 403, 36 St.Rep. 1866.

I would affirm the Workers' Compensation Court in this case.

_____
Justice

_____
Justice

-10-